1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                    EASTERN DISTRICT OF CALIFORNIA

10

11   LENY PETERSEN GALAFATE,              Case No.  1:17-cv-00708-AWI-MJS  (HC)

12              Petitioner,              **FINDINGS AND RECOMMENDATIONS
                                         (1) TO GRANT RESPONDENT'S MOTION TO**
13        v.                             **DISMISS AND (2) TO DISMISS THE
                                         PETITION AS TIME-BARRED**
14   DARRYL ADAMS, Warden

15              Respondent.              **(ECF NOS. 1, 12)**

16                                       **THIRTY (30) DAY OBJECTION DEADLINE**

17

18

19        Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas

20   corpus under 28 U.S.C. § 2254. Respondent is represented by Justain Paul Riley of the

21   Office of the California Attorney General.

22        Before the Court is Respondent's motion to dismiss the petition as time-barred.

23   (ECF No. 12.) It is beyond dispute that the petition was not timely filed under 28 U.S.C.

24   § 2244(d). The only question before the Court is whether Petitioner is entitled to an

25   equitable exception to the statute of limitations on the basis of actual innocence. For the

26   reasons stated below, the Court concludes that she is not. Accordingly, the undersigned

27   will recommend the petition be dismissed.

28

## I. Factual Background

The following facts are taken from the Fifth District Court of Appeal's April 8, 1991 opinion. They are not meaningfully disputed, except as discussed below in reference to the relatively recent post-trial declarations of Petitioner and her ex-husband. <u>See</u> 28 U.S.C. § 2254(e)(1) (state court factual findings are presumed correct, unless rebutted by clear and convincing evidence).

> In the mid-1980's, defendants Roman Galafate and his wife, Leny Petersen Galafate, resided with family members in Delano, California. Roman Galafate was an agent for Midland National Life Insurance Company and had an office in the MGM Professional Building at 1201 Jefferson Street in Delano. On September 9, 1985, defendants filed a voluntary petition in the United States Bankruptcy Court for the Eastern District of California. The court discharged their debts pursuant to chapter 7 of the Federal Bankruptcy Code on February 5, 1986.
>
> Defendants maintained close ties with members of their extended family, including Reny and Violeta Petersen. Reny Petersen was Leny's uncle, her father's brother. Defendant Leny Galafate regularly visited her aunt by marriage, Violeta Petersen, and was godmother of Reny and Violeta's minor son, Chris. Roman Galafate wrote insurance policies for various family members, including a $75,000 life insurance policy on Violeta Petersen in October 1985. That policy named her husband, Reny Petersen, as the beneficiary of the proceeds.
>
> Approximately two weeks after the defendants received their discharge in bankruptcy, Roman Galafate processed an application for a $250,000 insurance policy on the life of Violeta Petersen. The application was dated February 18, 1986, and named "Leny Petersen" as beneficiary of the proceeds. "Leny Petersen" was defendant Leny Galafate's maiden name. Leny signed her aunt's name on the policy application. Although Violeta's address was 20857 Francis Drive in Richgrove (Tulare County), the application bore Roman Galafate's post office box number in Delano.
>
> Sometime prior to Sunday, February 23, 1986, Roman Galafate purchased an $83 money order from the Miracle Market at 1643 Cecil Avenue in Delano. Store manager Pete Medrano required customers to pay cash for money orders

2

but did not require presentation of identification. According to Medrano, the store personnel generally filled in the amount of the money order and the customer completed the rest of the information. Although Roman admitted purchasing the $83 money order, the face of the instrument indicated Violeta Petersen purchased it on February 18, 1986.

Roman Galafate transmitted the completed application and money order to Midland National Life Insurance Company in Sioux Falls, South Dakota. Midland received the documents sometime between 6:15 a.m. on Friday, February 21, 1986, and 6:15 a.m. on Monday, February 24, 1986.[FN3]

> [FN3: The Sioux Falls office was not open on Saturday, February 22, 1986, or Sunday, February 23, 1986. The parties stipulated there was mail pickup at 6:15 a.m. on Friday, February 21, and the next pickup was at 6:15 a.m. on Monday, February 24. The insurance application was collected during the latter pickup. United States Postal Service Supervisor Martoria Sherman testified it would take a minimum of two days, and probably three, for a letter mailed in Delano to reach Sioux Falls.]

Reny Petersen last saw his 34-year-old wife, Violeta, at their Richgrove home on Saturday morning, February 22, 1986. Violeta had received her paycheck the day before and was carrying $500 in cash. She planned to pay bills that day.

At 6:50 p.m. that day, Martha Salinas was traveling northbound on Browning Road from McFarland to Delano. At the intersection of Browning and Pond Roads, Salinas saw a large car speeding westbound on Pond. The car went through a stop sign, swayed, and almost crashed into Salinas's car. Salinas saw the male driver pull the car over and park. A few minutes after 7 p.m., Salinas returned by the same route and saw a body in the roadway in the vicinity of where the car had been parked. The body had not been there earlier. Salinas stayed at the scene until law enforcement officers arrived. Kern County sheriff's deputies were dispatched to the scene and found the body of a fully clothed female lying on her back. A blueish-colored tongue protruded from the victim's mouth. The victim's sweater was pulled up over her head and a distinctive bruise surrounded her neck. Officers found a purse, jewelry, and several bank books scattered about the victim as well as loose fibers on her face and body. A wallet contained a driver's license in the name of

3

Violeta Bacena Petersen. The officers did not find any money in either the purse or the wallet.

That same evening, Reny Petersen stopped by his father's grave on his way home from work. Sometime after 6 p.m. Reny realized Violeta was gone. After unsuccessfully attempting to locate her, Reny filed a missing person report with Tulare County Sheriff's Detective Charles Denchfield around 10:30 p.m. Denchfield relayed the information to his communications unit, the Delano Police Department, and the Kern County Sheriff's Department. Around midnight, Kern County sheriff's detectives advised Reny his wife was dead. Detective Sergeant Craig Fraley took carpet samples from Reny Petersen's home several days later.

On February 24, 1986, Dr. Armand L. Dollinger, a forensic pathologist, performed an autopsy on the five-foot-three-inch, one-hundred-and-two-pound body of Violeta Petersen. Dollinger concluded Violeta died by asphyxiation caused by ligature strangulation sometime prior to 2 p.m. on February 22, 1986. The ligature could have been a rope or cord. The particularly prominent mark of the neck wound demonstrated considerable force was used to hold the ligature. Dollinger testified death by ligature strangulation would have taken several minutes. The right hyoid, a small bone in the throat, was fractured. Aside from the wounds to the neck, the victim had bruises on the back of the head, over the left eye, on the cheeks, and on the left wrist. The livor mortis (color from blood settling to the lower portion of the body), facial petechial hemorrhaging (breakage of small vessels), and flattening of the face showed the victim had been face down for at least two to six hours after death. James A. Malouf, a Kern County coroner's investigator, concluded the victim must have been killed elsewhere, placed face down for a time, and later left face up on Browning Road. The victim's pants were wet and her panty shield was soaked. However, there was no evidence of sexual assault. Dollinger said urination is a frequent occurrence during death by ligature strangulation.

During the autopsy, Kern County Criminalist Bernadetta Rickard collected trace evidence and took biological samples for analysis. She recovered fibers from the victim's neck wounds, body sheet, mouth, and hair. Rickard testified these fibers were collected before the body was disrobed. However, the fiber taken from the victim's mouth was recovered much later than the ones taken from the body sheet. Further, the envelope containing the mouth fiber did not specifically state

4

it had been recovered before the disrobing of the victim. The recovered fibers were various colors, including green, red, black, and multicolored. There were several red fibers but no green fibers in the neck wounds. There were one or two green fibers, and various multi-colored fibers in the mouth and on the tongue. Rickard found one green fiber on a lock of hair, another green fiber on another portion of the victim's hair, and at least two green fibers on the body sheet. Overall, the fibers were primarily green.

On the date of the autopsy, Roman Galafate III telephoned Midland National Life Insurance Company in Sioux Falls and reported Violeta Petersen had died on February 22. Roman requested instructions on completing a claim and also inquired whether Midland had received the victim's most recent policy application. Roman told Midland personnel the application had been filled out the preceding Tuesday or Wednesday. He reported there were two policies—one for $75,000 and one for $250,000. Roman said the victim had been so pleased with the first policy that she wanted a second policy. Donald Lemke, Midland Vice President of Claims, testified no policy was ever issued on the $250,000 application.

On February 26, 1986, Kern County sheriff's officers found Violeta's brown Honda Civic at the Sundance Inn, 405 Cecil Avenue, in Delano. The vehicle had been parked at the motel for a couple of days. The driver's seat had been adjusted to accommodate a driver taller than Violeta. The car was very clean and even the decedent's fingerprints could not be found on the vehicle. Law enforcement personnel unsuccessfully attempted to identify a print on the sun visor.

Sergeant Fraley took carpet samples from the motel. On March 18, 1986, Kern County Criminalist Gregory Laskowski conducted a fiber analysis on the material recovered from the victim's body. Laskowski concluded those fibers did not come from the carpet in the Petersen residence or the Sundance Inn.

On March 18, 1986, Roman telephoned Donald Lemke at the Midland office in Sioux Falls, and advised that Leny Petersen was his wife. Lemke questioned why the victim used the name of Petersen instead of Galafate in the beneficiary designation. Lemke noted Leny used the name Leny P. Galafate when she applied for status as an authorized agent with Midland on October 22, 1985. Roman promised to send Lemke information on the usage of Leny's maiden name. On

March 24, 1986, Lemke received a letter dated March 18, 1986, from Roman. However, the letter did not explain why the name Leny Petersen was used in the beneficiary designation. Lemke sent Roman a letter dated April 1, 1986, explaining what needed to be done to submit a claim regarding the $250,000 policy application. On April 7, 1986, Midland received a $250,000 claim dated April 4, 1986, and signed "L. Petersen."

Earlier in March 1986, Midland retained Donald Lake of Equifax Services to investigate the questionable claim. Lake obtained a statement from Leny Galafate on April 8, 1986. Leny said she learned of Violeta's death when her uncle Reny telephoned her late in the evening of February 22 or early morning of February 23. On April 14, 1986, Lake telephoned Kern County Sheriff's Detective Craig Fraley, the primary investigator assigned to the Violeta Petersen homicide case. Fraley immediately telephoned Donald Lemke in South Dakota and obtained several documents, including applications for insurance policies on Violeta's life.

On April 18, 1986, Donald Lake interviewed Roman in his Delano office and obtained a signed statement from him. Roman said Violeta took out a $75,000 insurance policy in October 1985 and designated her husband, Reny, as the beneficiary. Roman said Violeta decided to purchase a second, larger policy after making a number of visits to his office. Violeta also mentioned she was considering changing the beneficiary on the $75,000 policy. Violeta frequently visited her niece, Leny, at Roman's insurance office. During these Friday visits, Violeta often spoke with Roman about acquiring another policy.[FN4] However, it was not until a week before her death that Violeta actually applied for the policy. Roman told Lake he and Violeta were alone when the policy application was completed. Violeta's son, Chris, was in another room of the office suite until the "tail end" of the transaction. Roman was under the impression Violeta did not want Reny to know about the second policy. Roman said Violeta gave him cash to pay the premium because her checkbook was "kind of fouled up." Roman claimed he had taken the money to Presidio Savings and Loan in Delano on Saturday, February 15, 1986, but it was closed. He obtained a money order from the bank on Monday, February 17, 1986, and mailed the money order and application to Midland on the same day.

[FN4: Reny Petersen stated his wife had not been interested in insurance at all because she believed it was like a curse.]

On May 8, 1986, Sergeant Fraley conducted a consensual interview of Roman Galafate at his Delano office. Roman claimed he had last seen Violeta on the evening of Friday, February 21, 1986, at his insurance office. Roman admitted selling a $75,000 insurance policy to Violeta in 1985. A short time later, Violeta "started questioning" Roman about a $250,000 life insurance policy. Roman said Violeta also "attempted to change" the primary beneficiary on the $75,000 policy from her husband, Reny, to her niece, defendant Leny Galafate. Roman further claimed he sold Violeta the $250,000 insurance policy one week before her death and she had signed the application for it. Violeta gave Roman about $80 in cash so he could purchase a money order for the policy. Roman acknowledged sending the application to Midland National Life Insurance Company. Roman maintained Violeta wanted him to use a Richgrove post office box number as a return address. However, the application bore defendant Roman Galafate's post office box number. Roman informed Fraley about the pending insurance claim investigation and said he did not expect any payment to be made on the $250,000 policy application.

On June 2, 1986, Roman called Lemke for an update on the claims investigation. Lemke advised the insurance company was concerned about the authenticity of Violeta Petersen's signature on the $250,000 policy application. Roman said, "Right, well, you'll [sic] be sending a letter on that." On June 10, 1986, Lemke wrote Roman and repeated his concern about the signature on the policy application. Roman responded with a letter on his personal stationery, stating: "As addressed in your letter of June 10, 1986, which I have enclosed a copy, I will try to explain any unanswered questions you have directed to me." According to Roman, Violeta thought the $75,000 policy had lapsed and that Leny would apply for guardianship of Chris in the event of Violeta's demise. Roman indicated Leny had orally agreed to care for Violeta's child. Roman's letter did not answer Lemke's questions about the signature on the $250,000 policy application.

On June 11, 1986, Midland mailed Reny Petersen a check for $76,362.50, representing the proceeds from Violeta's 1985 policy plus interest. Before Reny cashed the check, defendants engaged him in a discussion about the insurance

money. Both defendants initially said he could not "get anything because the paper has been lapsed." Roman told Reny he would be in trouble because Violeta's policy had lapsed. Leny told her uncle he could not keep the money and said he should return it. Leny said she would accompany him to the bank so he could return the funds.

On June 23, 1986, Reny deposited $65,962.50 of the insurance money at Presidio Savings and Loan in Delano. Reny also put some of the insurance money in his Bank of America account. On June 25, 1986, Leny drove her uncle to the Delano branch of Bank of America and he withdrew $9,000 in cash from his account. Reny handed over all of this money to Leny while they were still in the bank. Reny also gave Leny another $1,000 in cash he had previously retained when he first deposited the insurance check.

On July 8, 1986, Leny and Reny went to the Presidio Savings and Loan and Reny signed a document in Leny's presence. Reny believed that document would return the insurance proceeds to Midland National. In fact, Presidio issued Reny a cashier's check in the sum of $66,000. On the same date, someone deposited $68,330.60 into an account at the main branch of Santa Barbara Savings in Bakersfield. The account was in the name of "Roman Galafate Insurance and Financial Services Center." Part of that deposit consisted of a $66,000 cashier's check issued by Presidio Savings to Reny B. Petersen. Santa Barbara Savings Supervisor Raul Holquin could not identify the person who deposited the cashier's check. However, Santa Barbara Savings' policy prohibited a third person from making a deposit on someone else's account. On the same date, someone withdrew $61,180 from Roman Galafate's account. Midland National never received any money back from the $75,000 Petersen claim.

On July 25, 1986, Donald Lemke wrote defendants and denied the $250,000 claim. The company did not issue a policy in response to the application.

On November 13, 1986, Detective Fraley interviewed Leny at her home after advising her of her Miranda[FN5] rights. Roman was present during a portion of the interview. Leny claimed Violeta was going to go shopping with Leny's mother on Saturday, February 22, 1986. Three times during the course of the interview, Leny denied signing the insurance application.[FN6] Leny provided Fraley with four handwriting exemplars.

[FN6: The Court cautioned the jury it could only consider Roman's statements to Fraley against Roman and Leny's statements to Fraley against Leny.]

Fraley submitted Leny's handwriting exemplars to Kern County Deputy Sheriff Cheryl Gottesman, an examiner of questioned documents. Gottesman examined Leny's exemplars, the signature on the $250,000 application, and the signatures on the credit cards issued to Violeta Petersen. Magnification of the signature on the application disclosed the letters had been carefully and individually formed, and later linked together. The style of subsequently connecting separate letters suggested a forgery. On March 18, 1987, Gottesman reported the person who signed Violeta's name on the application was not the same person who had signed the credit cards. She further reported there was a strong similarity between the signature on the application and Leny Galafate's handwriting. However, Leny's exemplars were basically printed and Gottesman lacked sufficient cursive writing to make a positive comparison.

On September 23, 1987, Leny provided another handwriting exemplar for Gottesman's examination. In a report dated September 29, 1987, Gottesman concluded the person who completed and signed the two sets of exemplars with the name Leny P. Galafate was the same person who had signed the name Violeta Petersen on the insurance application. Gottesman explained Leny's signature was consistently raised above the signature line on the exemplars in the same fashion as the signature on the insurance application.

On January 12, 1988, Christopher Hillis, an investigator for the Kern County District Attorney's office, seized carpet samples from Roman's insurance office.[FN7] Hillis also noticed a large stain on the green carpeting. He returned later to cut out the stained carpet section for a urine analysis. On February 11, 1988, Hillis delivered the carpet samples from Roman's office to Laskowski. Laskowski determined the green carpeting in Roman's insurance office was "microscopically and chemically consistent" with the green fibers found on Violeta's body. Laskowski testified it was impossible to determine whether the green fibers came from the carpet in Roman's office because carpeting is manufactured in bulk and is widely distributed. Subsequent tests on the stained section of the carpet neither revealed nor ruled out the presence of urine.

9

[FN7: In 1986, Criminalist Gregory Laskowski concluded neither the carpet in the Petersen home nor the carpet at the Sundance Inn was similar to the green fibers removed from Violeta's body. No carpet samples were taken from Roman's office until 1988. The green carpeting in Roman's office had been installed prior to February 1986.]

On cross-examination, Laskowski conceded there are several types of nylon fiber and his test did not show whether or not the fibers recovered from the body were of the same type of nylon as that contained in Roman's office carpet. Assuming the fibers were recovered from the victim's back, mouth, and hair, the criminalist concluded the victim had "total body contact" with the carpet. In other words, she either had been wrapped up in the carpet or had been laying upon it. However, there was no evidence any of the fibers were recovered from the victim's back. Laskowski also testified some of the mouth fibers could have come from the victim's clothing.

On March 9, 1988, Investigator Hillis spoke with Leny Galafate on the telephone to "give her an opportunity to clear up some inconsistencies," since she was suspected of forgery. The next day, Hillis and Assistant Chief Investigator Dwight Pendleton contacted Mrs. Galafate at her in-laws' home in Earlimart and asked her to come to the Delano police station for an interview. Leny Galafate requested an opportunity to contact her attorney, Heberto Sala of Bakersfield. She eventually accompanied the investigators to the police station after they allegedly threatened to put her children in a shelter. At the station, Leny acknowledged to Hillis she had signed Violeta Petersen's name on the insurance application four days before Violeta's death. Leny claimed Violeta asked her to sign the document because her child was "acting up." Although Roman was present at the time, his back was turned and he did not know Leny had signed the document.

Investigator Hillis testified the Kern County District Attorney charged defendants with the murder of Violeta Petersen on March 23, 1988.

### Defense

Family members attested to the close relationship between the Galafates and the Petersens. Leny Galafate was the godmother of the Petersen's son, Chris. Defense counsel

argued the jury would have to believe Leny conspired to kill a friend and family member who trusted her. Counsel claimed Violeta sought a larger policy so Leny would be able to care for Chris.

Dr. Dollinger testified the victim died sometime prior to 2 p.m. on February 22, 1986. Leny's sister, Sol Petersen, lived with the defendants and testified they were at home the entire day of February 22, 1986. She said they slept in until noon, took showers and ate lunch, and then stayed at the house to watch television and do housework. Leny's younger sister, Joey Petersen, testified Leny felt ill after Violeta died.

Defense counsel proffered alternative theories of the case during closing argument. First, counsel suggested the green fibers on Violeta's body might have come from clothes she regularly wore to Roman's insurance office. Second, counsel suggested a robbery for $500 as a possible motive for the crime. Third, counsel also suggested some sort of sordid affair led to Violeta's death. Counsel pointed out Violeta's car was discovered at a motel, her wedding band was found at home after the murder, and she was planning an extended trip to the Philippines without her husband. Fourth, counsel pointed out it made no sense for the Galafates to kill Violeta before Midland National received the policy application in Sioux Falls. Finally, counsel argued it did not make sense to kill Violeta in the insurance office because the MGM Professional Building was located near the Delano police and fire stations.

Defense counsel also introduced evidence of defendants' good and kind character. Several defense witnesses testified Roman and Leny Galafate were not violent people. The defendants did not testify on their own behalf.

(Lodged Doc. 2.)

## II.    Procedural History

On January 23, 1989, Petitioner was convicted of first degree murder for financial gain and conspiracy to commit murder for financial gain. She was sentenced to life without the possibility of parole on the murder count and twenty-five years to life on the conspiracy count. (Lodged Docs. 1-2.)

Petitioner appealed. On April 8, 1991, the California Court of Appeal for the Fifth Appellate District affirmed. (Lodged Doc. 2.) Petitioner filed a petition for review with the California Supreme Court, which was denied on July 11, 1991. (Lodged Docs. 3-4.)

Petitioner proceeded to file eight post-conviction challenges, as follows[1]:

1. <u>Kern County Superior Court</u>
   Filed: April 17, 1997;
   Denied: May 8, 1997;

2. <u>Kern County Superior Court</u>
   Filed: July 15, 2013;
   Denied: October 23, 2013;

3. <u>California Court of Appeal, Fifth Appellate District</u>
   Filed: January 8, 2014;
   Denied: February 14, 2014;

4. <u>Kern County Superior Court</u>
   Filed: February 26, 2015;
   Denied: June 2, 2015.

5. <u>California Court of Appeal, Fifth Appellate District</u>
   Filed: July 13, 2015
   Denied: October 23, 2015

6. <u>California Court of Appeal, Fifth Appellate District</u>
   Filed: March 10, 2016
   Denied: May 27, 2016

7. <u>California Court of Appeal, Fifth Appellate District</u>
   Filed: August 23, 2016
   Denied: November 23, 2016

8. <u>California Supreme Court</u>
   Filed: January 23, 2017
   Denied: March 1, 2017

(Lodged Docs. 5-20.)

**A.    Fourth Petition**

Beginning with her fourth post-conviction challenge, filed February 26, 2015, Petitioner began to raise the issue presented on the instant petition, i.e., her actual innocence of the offense as demonstrated by a confession authored by her ex-husband

---

[1] Under the mailbox rule, the Court deems petitions filed on the date Petitioner handed a petition to prison authorities for mailing. <u>Houston v. Lack</u>, 487 U.S. 266, 276 (1988); <u>Campbell v. Henry</u>, 614 F.3d 1056 (9th Cir. 2010); <u>see also</u> Rule 3(d) of the Rules Governing Section 2254 Cases.

12

and co-defendant, Roman Galafate III. (Lodged Doc. 11.) In a December 12, 2014, declaration, Roman[2] confessed, reportedly for the first time, that he carried out the murder. Roman explained that the murder was not pre-planned and had occurred accidentally and on the spur of the moment during an argument. He stated that Petitioner had no knowledge of or involvement in the murder. (Id.) Petitioner also presented her own declaration, denying any knowledge of or involvement in the murder. (Id.)

The Superior Court denied the petition as follows:

> Petitioner contends that given the recent extrajudicial confession of sole culpability by her ex-husband, she is innocent. She divorced Roman in 2009. She contends that the confession declaration signed by Roman Galafate on December 12, 2014 is newly discovered evidence which fundamentally undermines the prosecution's case. She further asserts in her own declaration that had she known of Roman's plans, she would have called the police or did what she could to stop the murder. Roman's declaration was as shocking to her as the death of her aunt. It is due to her ex-husband's actions that she has been unjustly languishing in prison for all this time. All this time she did not know who murdered her aunt on January 22, 1986, and like her ex-husband, asserted her innocence. She did not testify at the trial upon the advice of counsel.

> . . . .

> Generally, newly discovered evidence is not cognizable in habeas corpus unless it fundamentally undermines the prosecution's evidence, not merely casts doubt upon it. *In re Lindley (1947) 29 Cal.2d 709, 723, 725, People v. Ebaniz (2009) 175 Cal.App.4th 142.* To prevail in a claim of innocence, petitioner must also show that the newly discovered evidence not only fundamentally undermines the prosecution's case, but also demonstrates reduced culpability. *In re Hall (1981) 30 Cal.3d 408, 410, 424, In re Clark (1993) 5 Cal.4th 750, 766.*

---

[2] Because Petitioner and her husband share the same last name, his first name is used herein for purposes of brevity and clarity.

There is a cogent argument that Mr. Galafate's role in the crime is not newly discovered evidence since it existed as of on or before January 22, 1986. The confession however did not become available until December 18, 2014. The question is as to the reliability of the confession. Extrajudicial confessions such as we have here are inherently untrustworthy because there is no way to cross-examine the confessor. *Bruton v. U.S. (1968) 391 U.S. 123, People v. Anderson (1987) 43 Cal.3d 1104, 1122.* The same reliability problems exist with recantation of witnesses. *In re Clark (1993) 5 Cal.4th 750, 766, Cotton v. Shriro (9th Cir. 2009) 360 Fed. Appx. 779.*

Mr. Galafate's confession is unreliable since it is self-serving. He has nothing to lose by confessing since he cannot suffer any greater punishment. Though confessing his involvement in Violeta Peterson's [sic] murder may clear his conscience, it does very little if anything to clear petitioner of culpability. It does not exonerate her because there is still an abundance of circumstantial evidence linking petitioner to her aunt's murder. Where such circumstantial evidence exists, a confession by a co-defendant is not enough to sustain a claim of innocence. *People v. Homick (2012) 55 Cal.4th 816, 850, People v. Hajek (2014) 58 Cal.4th 1144, 1173.*

Mrs. Peterson [sic] was strangled without any excuse of justification. Petitioner assisted her husband in taking out a $250,000 life insurance policy on her aunt's life by forging her signature. Petitioner defrauded her uncle of $75,000.00 life insurance proceeds by false pretenses, as Rene Peterson [sic] was in fact eligible for those funds. Instead, petitioner conspired to and hand knowledge that her husband Roman converted those proceeds by placing them into the bank to inure to the benefit of her husband and herself. The fact that Midland Life Insurance Co. never paid out on the $250,000 life insurance policy is of no consequence. The circumstantial evidence establishes that petitioner and her husband conspired to commit murder and did in fact murder Violeta Peterson [sic] for the life insurance proceeds. Though Petitioner may have played a lesser role in the actual murder, this does not absolve her of culpability. She had knowledge of her husband's acts, and did nothing about it believing that the life insurance policies would take care of their financial problems after previously filing for bankruptcy in October 1985.

Petitioner's declaration is also self-serving in that it virtually mirrors that of her ex-husband. It mentions nothing

14

about forging the life insurance policy and deposit of funds which did not belong to the couple in their bank account. All these above-mentioned factors along with the circumstantial evidence not only provide a motive to murder Violeta Peterson [sic] but to also link petitioner to the murder. . . .

(Lodged Doc. 12.)

## B.    Fifth Petition

Petitioner presented these same arguments and declarations to the Fifth District Court of Appeal on July 13, 2015. (Lodged Doc. 13.) The Court of Appeal denied the petition without prejudice on the ground that the declarations "are on information and belief and, thus, 'were devoid of any evidentiary value.'" (Lodged Doc. 14 (citation omitted)).

## C.    Sixth Petition

On March 10, 2016, Petitioner returned to the Fifth District Court of Appeal with revised declarations. (Lodged Doc. 15.) The substantive facts contained in the declarations were unchanged from the prior versions. The Court of Appeal again denied the petition without prejudice, noting the following:

> There are three aspects of the declaration of Roman Galafate (Declaration) which undermine its credibility
>
> First, the Declaration asserts that the victim was killed by strangling her with her sweater. This assertion is inconsistent with the type of wound described in the nonpublished appellate opinion in *People v. Galafate* (Apr. 8, 1991, F012067) (Opinion), which could have been made with "a rope or cord."
>
> Second, the Opinion also states that the strangulation required "considerable force" that had to be applied for "several minutes," which supports an inference that the killing was intentional contrary to the assertions in the Declaration.
>
> Third, the Declaration also does not mention or explain the other injuries to the victim.
>
> More importantly, the Declaration does not undermine the facts linking petitioner to the killing. (*Hardy, supra,* 41 Cal.4th at pp. 1016-1018.) The Opinion notes that petitioner

15

confessed that she signed the victim's name on an insurance application for $250,000 four days before the victim's death and petitioner was the beneficiary. On the application, petitioner signed her name, "Leny Petersen," instead of her married name, Leny Galafate, which creates an inference that there was an intent to mislead the insurance company. Roman was asked by an insurance agent to explain the discrepancy in petitioner's name on the application. He did not provide an explanation at that time or in his Declaration. In April 1986, the insurance company received a claim for $250,000, which was signed, "'L. Petersen.'" The Declaration does not attempt to explain petitioner's conduct in submitting the claim or persuading the victim's husband to give her the insurance proceeds from the victim's life insurance policy.

(Lodged Doc. 16.)

### D.    Seventh Petition

On August 23, 2016, Petitioner returned again to the Fifth District Court of Appeal with new declarations. (Lodged Doc. 17.) In her own declaration, Petitioner explained that her actions in relation to the two life insurance policies were undertaken at her husband's direction and control. Roman declared likewise that he directed Petitioner in this conduct, through manipulation, dominion, and Petitioner's obedience. Both declared that, in undertaking these actions, Petitioner was unaware that Roman had any intent to commit murder. The petition was summarily denied. (Lodged Doc. 18.)

### E.    Eighth Petition

On January 23, 2017, Petitioner presented her claim of actual innocence – including the declarations presented with her seventh petition – to the California Supreme Court. (Lodged Doc. 19.)   The petition was summarily denied. (Lodged Doc. 20.)

### F.    Federal Petition

Petitioner filed the instant petition on May 21, 2017. (ECF No. 1.) On August 29, 2017, Respondent filed a motion to dismiss. (ECF No. 12.) Petitioner filed no opposition and the time for doing so has passed. The matter is submitted.

### III. Procedural Grounds for Motion to Dismiss

Rule 4 of the Rules Governing Section 2254 Cases allows a district court to dismiss a petition if it "plainly appears from the petition and any attached exhibits that the petitioner is not entitled to relief in the district court . . . ." Rule 4 of the Rules Governing Section 2254 Cases.

The Ninth Circuit has allowed respondents to file a motion to dismiss in lieu of an answer if the motion attacks the pleadings for failing to exhaust state remedies or being in violation of the state's procedural rules. See, e.g., O'Bremski v. Maass, 915 F.2d 418, 420 (9th Cir. 1990) (using Rule 4 to evaluate motion to dismiss petition for failure to exhaust state remedies); White v. Lewis, 874 F.2d 599, 602-03 (9th Cir. 1989) (using Rule 4 as procedural grounds to review motion to dismiss for state procedural default); Hillery v. Pulley, 533 F.Supp. 1189, 1194 & n. 12 (E.D. Cal. 1982) (same). Thus, a respondent can file a motion to dismiss after the court orders a response, and the Court should use Rule 4 standards to review the motion. See Hillery, 533 F. Supp. at 1194 & n. 12.

In this case, Respondent's motion to dismiss is based on a violation of the one-year limitations period. 28 U.S.C. § 2244(d)(1). Because Respondent's motion to dismiss is similar in procedural standing to a motion to dismiss for failure to exhaust state remedies or for state procedural default and Respondent has not yet filed a formal answer, the Court will review Respondent's motion to dismiss pursuant to its authority under Rule 4.

### IV. Discussion

#### A. Commencement of Limitations Period

The instant petition was filed after April 24, 1996 and is subject to the Antiterrorism and Effective Death Penalty Act of 1996 (hereinafter "AEDPA"). AEDPA imposes various requirements on all petitions for writ of habeas corpus filed after the date of its enactment. Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059, 2063 (1997);

<u>Jeffries v. Wood</u>, 114 F.3d 1484, 1499 (9th Cir. 1997).

AEDPA imposes a one-year period of limitation on petitioners seeking to file a federal petition for writ of habeas corpus. 28 U.S.C. § 2244(d)(1). As amended, § 2244, subdivision (d) reads:

> (1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of –
>
> > (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
> >
> > (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
> >
> > (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
> >
> > (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.
>
> (2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

28 U.S.C. § 2244(d).

Under § 2244(d)(1)(A), the limitations period begins running on the date that the petitioner's direct review became final or the date of the expiration of the time for seeking such review.[3] Here, however, Petitioner's conviction became final prior to AEDPA's enactment. Accordingly, Petitioner had a one-year "grace period" following AEDPA's April 24, 1996 enactment to file her federal petition. Absent tolling, her petition was due one year later, on April 24, 1997. <u>Malcom v. Payne</u>, 281 F.3d 951, 955 (9th Cir. 2002); <u>Patterson v. Stewart</u>, 251 F.3d 1243, 1246 (9th Cir. 2001).

---

[3] The limitations period may begin running later under certain specified circumstances, none of which are applicable here. 28 U.S.C. § 2244(d)(1)(B)-(D).

**B.    Statutory Tolling**

28 U.S.C. § 2244(d)(2) states that the "time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward" the one year limitation period. Here, Petitioner filed one state post-conviction challenge during the limitations period. She therefore is entitled to statutory tolling from the filing of her first petition on April 17, 1997, to the disposition of that petition on May 8, 1997, for twenty-two total days of tolling. See Tillema v. Long, 253 F.3d 494 (9th Cir.2001) (state petition filed before limitations period begins to run tolls the limitations period); Pace v. DiGuglielmo, 544 U.S. 408, 410 (2005). This tolling extended the deadline for filing her federal petition from April 24, 1997 to May 16, 1997.

Petitioner did not file another State post-conviction challenge until July 15, 2013, more than fifteen years later. Neither this petition, nor her subsequent petitions served to toll the statute of limitations under § 2244(d)(2). Ferguson v. Palmer, 321 F.3d 820, 823 (9th Cir. 2003) (petitions filed after the limitations period expires do not toll the statute of limitations); Jimenez v. Rice, 276 F.3d 478, 482 (9th Cir. 2001) (same).

Petitioner's federal petition was due on or before May 16, 1997. It was filed May 21, 2017, more than twenty years too late.[4]

**C.    Actual Innocence Exception to the Statute of Limitations**

"[A]ctual innocence, if proved, serves as a gateway through which a petitioner may pass whether the impediment is a procedural bar . . . or . . . expiration of the statute of limitations." McQuiggin v. Perkins, 569 U.S. 383, 386 (2013). Thus, "a petitioner is not barred by the AEDPA statute of limitations from filing an otherwise untimely habeas petition if the petitioner makes a credible showing of 'actual innocence' under Schlup v. Delo." Lee v. Lampert, 653 F.3d 929, 945 (9th Cir. 2011) (citing Schlup, 513 U.S. 298 (1995)). To pass through the "Schlup gateway" a petitioner must present evidence of

---

[4] Petitioner has not presented any argument to suggest she is entitled to equitable tolling.

innocence so strong that "it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." Schlup, 513 U.S. at 327; see also McQuiggin, 569 U.S. at 384. "[A] petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." McQuiggin, 569 U.S. at 386 (citing Schlup, 513 U.S. at 329); see also House v. Bell, 547 U.S. 518, 538 (2006) (emphasizing that the Schlup standard is demanding and seldom met).

The petitioner must "support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." Schlup, 513 U.S. at 324. In the few cases where a petitioner has qualified for an actual innocence exception, the new evidence typically consisted of "credible evidence that the petitioner had a solid alibi for the time of the crime, numerous exonerating eyewitness accounts of the crime, DNA evidence excluding the petitioner and identifying another potential perpetrator, a credible confession by a likely suspect explaining that he had framed the petitioner, and/or evidence contradicting the very premise of the prosecutor's case against the petitioner." Stidham v. Cate, Case No. 10-CV-0120-GAF, 2010 WL 5463795, at *8 (C.D. Cal. Oct. 28, 2010) (collecting cases).

Here, Petitioner has brought a free-standing actual innocence claim but does not expressly argue that her evidence is sufficient to allow her to pass through the "Schlup gateway" and to avail herself of an equitable exception to the statute of limitations. Nonetheless, because this is the only apparent means by which the Court may consider the petition, the Court will consider whether Petitioner has met the "extremely high hurdle" posed by Schlup. See Stewart v. Cate, 757 F.3d 929, 938 (9th Cir. 2014). The Court concludes she has not.

The declaration submitted by Roman, Petitioner's ex-husband and co-defendant is insufficiently credible, reliable, or trustworthy to persuade the Court that "no juror,

acting reasonably, would have voted to find [Petitioner] guilty beyond a reasonable doubt." McQuiggin, 569 U.S. at 386. Roman is serving a life sentence and the opportunities for him to challenge his sentence have long passed. He therefore has nothing to lose by professing his exclusive role in the murder or lying about Petitioner's participation. In other words, he may assume responsibility for the offense with no real risk to his own liberty. Such confessions are regularly rejected as the basis for an actual innocence finding unless combined with other credible evidence. See House, 547 U.S. at 552 (confessions by inmates and suspects have less probative value than confessions by "eyewitnesses with no evident motive to lie"); Morris v. Hill, No. 13–55143, 2015 WL 1021120, at *2 (9th Cir. Mar. 10, 2015) (citing House and noting that "a credible confession by the actual perpetrator may affirmatively demonstrate actual innocence," but a felon serving a life sentence has "nothing to lose by confessing"); Garmon v. Foulk, No. CV 14-0125 JCG, 2015 WL 1457629, at *6 (C.D. Cal. Mar. 30, 2015) (same); Smith v. Baldwin, 510 F.3d 1127, 1141 (9th Cir. 2007) (noting that declarant was "serving a life term in prison" and thus "face[d] almost no consequences for lying"); Carriger v. Stewart, 132 F.3d 463, 476 (9th Cir. 1997) (confession of alleged perpetrator was considered as evidence in support of actual innocence claim where the alleged perpetrator "was opening himself to prosecution for capital murder and a possible sentence of death" by confessing).

Furthermore, the only explanation given for Roman having waiting nearly twenty years before confessing is that he wished to clear his conscience. This largely unexplained delay casts some doubt on the reliability of the confession. See Cotton v. Schriro, 360 F. App'x 779, 780 (9th Cir. 2009) (discounting recantation affidavits presented two, six, and ten years after trial where there was "[n]o satisfactory explanation . . . given as to why" the affiants waited to come forward); Garmon, No. CV 14-0125 JCG, 2015 WL 1457629, at *6 (C.D. Cal. Mar. 30, 2015) (discrediting affidavit identifying someone other than the petition as the shooter, where it was presented five

years after the incident and without explanation for the delay); <u>Herrera v. Collins</u>, 506 U.S. 390, 423 (1993) (O'Connor, J., concurring) (affidavits made many years after trial, purporting to exculpate a convicted prisoner through a new version of events, are "not uncommon" and "are to be treated with a fair degree of skepticism").

Finally, the facts set forth in Roman's declaration do little to persuasively prove Petitioner's factual innocence. As an initial matter, and as noted by the Fifth District Court of Appeal, Roman's account of the murder is inconsistent with the trial evidence, as summarized on appeal. (Lodged Doc. 16.) <u>Cf. Carriger</u>, 132 F.3d at 476 (confession found credible where it contained details that could only have been known to participant in the crime). Additionally, it is undisputed at this stage that the jury was presented with substantial evidence to support Petitioner's involvement in murder for financial gain and conspiracy to commit same. One week before the murder, Petitioner forged a life insurance policy on behalf of the victim, which named Petitioner herself as the beneficiary by way of her maiden name. Petitioner then collected on a separate life insurance policy under the pretense that she was returning the proceeds from the beneficiary (the victim's husband) to the insurance company. Instead, the proceeds were deposited into Roman's account and then withdrawn in cash. While Petitioner now attempts to explain these actions by claiming she was under the influence of her husband, this explanation, even if true, does not constitute new evidence. Furthermore, this explanation was not presented until after the state courts found Roman's prior declarations insufficient. While the changes to Petitioner's and Roman's declarations are not inconsistent with their prior declaration, the continuing evolution of Petitioner's claim of actual innocence is clearly influenced by the deficiencies perceived by the state courts.

These attempts to adapt the declarations to enhance their credibility has the opposite effect.

In light of these factors, the Court cannot concude that "all reasonable jurors would choose to believe the proffered testimony." Smith v. Baldwin, 510 F.3d at 1142 & n.11 (en banc) (noting that petitioner must show that every reasonable juror would find it more likely than not that the actual perpetrator "at long last, has decided to tell the truth.") Accordingly, Petitioner is not entitled to an equitable exception to the statute of limitations, and her petition should be dismissed as time-barred.

## V.   Conclusion and Recommendation

In light of the foregoing analysis, it is HEREBY RECOMMENDED that Respondent's motion to be dismissed be granted and that the petition be dismissed as time-barred.

The findings and recommendation are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1). Within **thirty** (30) days after being served with the findings and recommendation, any party may file written objections with the Court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within fourteen (14) days after service of the objections. The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal. Wilkerson v. Wheeler, 772 F.3d 834, 839 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   December 29, 2017        /s/ *Michael J. Seng*
                                   UNITED STATES MAGISTRATE JUDGE